(731 P.2d 887)

No. 59,394

In the Interest of T.K., a minor child.

Opinion filed January 29, 1987.

*Evan Nightingale*, of Ulysses, for the appellant.

*B. Steven Upshaw*, county attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before BRISCOE, P.J., PHILIP C. VIEUX, Associate District Judge, assigned, and RICHARD B. WALKER, Associate District Judge, assigned.

WALKER, J.: This is an appeal from the decision of the district court affirming the finding by a district magistrate court that T.K. was a juvenile offender. Also appealed is the district court's denial of T.K.'s motion to dismiss on the basis that de novo review was not held in a timely manner.

T.K.'s adjudication as a juvenile offender arose out of two separate incidents at his home in Grant County. In the first incident on March 25, 1985, the testimony indicated that T.K.'s mother called him for school early one morning. When T.K. did not respond, his mother went to his room and called again. T.K.

rebuffed his mother by telling her he would not get up for school until noon. Shortly afterward, T.K.'s mother once against attempted to rouse him, at which time T.K. leaped from his bed and went into his closet. The mother testified she knew T.K. had his shotgun in the closet and she heard him click the action on the gun as if he were loading a shell. T.K.'s mother then went back upstairs. She testified she decided not to push him any further because she was afraid of what he would do.

The second incident occurred some four months later, on July 30, 1985, and involved T.K.'s father. T.K.'s father testified that he entered their rural residence one day and was informed by his wife that she and T.K. had been arguing. T.K.'s father confronted T.K. for the purpose of discussing this incident, which ultimately led to a wrestling match between father and son on the floor of the family dining room. The upshot was that T.K.'s father ordered T.K. to leave the house. T.K. complied and was followed outside by his father. T.K. then picked up a partially burned Christmas tree stump and came running toward the house with it. T.K.'s father testified that as T.K. was approaching the house he was uttering threats and warning his father that he could not be stopped from entering the house. Testimony also indicated that T.K. had the stump raised above his head and appeared to be in a mood to try to use it. T.K.'s father stepped back and let T.K. enter the house. Shortly thereafter, law enforcement authorities arrived and took T.K. into custody.

A detention hearing was held on the following day, July 31, 1985. The magistrate judge ordered T.K. detained and further ordered that a predisposition investigation occur. Detention was reviewed by the magistrate judge on September 9, 1985, and T.K. was further ordered held until the adjudication hearing.

On September 12, 1985, an adjudication hearing was held before the magistrate judge, which resulted in a finding that T.K. had committed two separate assaults based on the incidents on March 25 and July 30, 1985. T.K. was adjudicated a juvenile offender and placed in the temporary care and custody of SRS.

The next day, September 13, 1985, T.K.'s attorney filed a notice of appeal with the district court for a de novo review of the magistrate judge's decision. On October 25, 1985, T.K.'s attorney filed a motion to dismiss for failure to hold the de novo hearing

within 30 days of the appeal under K.S.A. 38-1683(a). Nothing further occurred in the case until February 5, 1986, when the district judge sent a letter to the parties affirming the adjudication of T.K. as a juvenile offender, affirming the disposition, and denying the motion to dismiss. A journal entry to that effect was filed March 5, 1986.

As his first issue on appeal, T.K. contends the district judge erred in denying his motion to dismiss for failure to provide a timely de novo hearing on his appeal from the order entered by the magistrate judge. Appeals in juvenile offender cases are generally governed by K.S.A. 38-1681 *et seq.* At issue here is the interpretation to be given K.S.A. 38-1683(a), which provides:

"An appeal from an order entered by a district magistrate judge shall be to a district judge. The appeal shall be heard *de novo* within 30 days from the date the notice of appeal was filed."

In this case, the notice of appeal from the order entered by the magistrate judge was filed on September 13, 1985, and there was no ruling by the district judge until either February 5 or March 5, 1986, depending on whether the judge's letter or the journal entry of the hearing on the latter date is used as the final decision point. Apparently the district judge conducted his review by listening to the audio tapes of the adjudication hearing conducted by the magistrate judge.

The parties are in conflict as to the effect of this procedural violation. T.K. takes the position that the 30-day hearing requirement either creates a statutory right to a speedy trial, or codifies the constitutional right to a speedy trial equivalent of the speedy trial rights that are enjoyed by a criminal defendant. He therefore argues that failure to hold a timely review hearing requires dismissal of the charges.

This precise issue has not previously received appellate consideration in Kansas. However, in the case of *Findlay v. State,* 235 Kan. 462, 681 P.2d 20 (1984), the juvenile involved made a similar argument that he was constitutionally entitled to a jury trial. On that occasion our Supreme Court soundly rejected the proposition that district court proceedings in juvenile offender cases are essentially criminal trials. The *Findlay* court took particular notice of the portions of K.S.A. 38-1601 which provided:

" 'K.S.A. . . . 38-1601 through 38-1685 shall be known and may be cited as the Kansas juvenile offenders code and shall be liberally construed to the end that each juvenile coming`within its provisions shall receive the care, custody, guidance, control and discipline, preferably in the juvenile's own home, as will best serve the juvenile's rehabilitation and the protection of society. *In no case shall any order, judgment or decree of the district court, in any proceedings under the provisions of this code, be deemed or held to import a criminal act on the part of any juvenile; but all proceedings, orders, judgments and decrees shall be deemed to have been taken and done in the exercise of the parental power of the state.'* (Emphasis supplied.)" 235 Kan. at 463.

Concluding there was no federal or state constitutional right to a trial by jury under the Kansas Juvenile Offenders Code, the *Findlay* court recognized the unique nature of juvenile proceedings:

" 'If the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence. Perhaps that ultimate disillusionment will come one day, but for the moment we are disinclined to give impetus to it.' " *Findlay*, 235 Kan. at 463 (quoting *McKeiver v. Pennsylvania*, 403 U.S. 528, 551, 29 L. Ed. 2d 647, 91 S. Ct. 1976 [1971]).

Further buttressing this distinction between juvenile proceedings and criminal matters is the language of K.S.A. 38-1683(b), which provides that appeals are to be governed by the Kansas Code of Civil Procedure. This clearly indicates that the legislature intended juvenile matters to have a separate and distinct existence completely apart from criminal procedure. We conclude that juveniles do not have a constitutional right to a speedy trial in matters conducted under the Kansas Juvenile Offenders Code, and K.S.A. 38-1683(a) is not intended as a statutory codification of a right to speedy trial.

Though not specifically raised by appellant, this court has also considered the question of whether the 30-day time period under K.S.A. 38-1683(a) is directory or mandatory. If it is mandatory, the juvenile would be entitled to a dismissal of the cases against him on a completely independent basis from any constitutional concerns. If, on the other hand, the 30-day period is merely a directory provision, no such dismissal would be justified. Once again there are no Kansas cases explicitly on this point, but directory and mandatory statutes have been discussed at length in *Wilcox v. Billings*, 200 Kan. 654, 657-58, 438 P.2d 108 (1968):

"No absolute test exists by which it may be determined whether a statute is directory or mandatory. Each case must stand largely on its own facts, to be determined on an interpretation of the particular language used. Certain rules and aids to construction have been stated. The primary rule is to ascertain legislative intent as revealed by an examination of the whole act. Consideration must be given to the entire statute, its nature, its object, and the consequences which would result from construing it one way or the other. It has been said that whether a statute is directory or mandatory depends on whether the thing directed to be done is of the essence of the thing required, or is a mere matter of form. Accordingly, when a particular provision of a statute relates to some immaterial matter, as to which compliance with the statute is a matter of convenience rather than substance, or where the directions of a statute are given merely with a view to the proper, orderly, and prompt conduct of business, it is generally regarded as directory, unless followed by words of absolute prohibition; and a statute is regarded as directory where no substantial rights depend on it, no injury can result from ignoring it, and the purpose of the legislature can be accomplished in a manner other than that prescribed, with substantially the same results. On the other hand, a provision relating to the essence of the thing to be done, that is, to matters of substance, is mandatory, and when a fair interpretation of a statute, which directs acts or proceedings to be done in a certain way, shows that the legislature intended a compliance with such provision to be essential to the validity of the act or proceeding, or when some antecedent and prerequisite conditions must exist prior to the exercise of power or must be performed before certain other powers can be exercised, the statute must be regarded as mandatory. (82 C.J.S., Statutes, § 376.)"

Applying the benchmarks elaborated by the Supreme Court in *Wilcox*, it is apparent that the 30-day period given the district judge to hear an appeal from a magistrate judge in K.S.A. 38-1683(a) is directory rather than mandatory.

While the 30-day requirement is clear and unambiguous, its provisions must be read in concert with 38-1601, the general legislative purpose section. To automatically throw out a case that was not heard de novo by a district judge on the 31st day following appeal would not be consistent with the legislative instructions that the Code be "liberally construed" for the ends enumerated.

In addition, a rigid and legalistic interpretation of the appeal provisions does little to further the parental interests of the State. While the clear purpose of 38-1683(a) is to provide a prompt review of the district magistrate judge's decision, order and promptness are the general characteristics of a directory statute.

The legislature itself has provided no remedy where the 30-day limit has been transgressed. The main legislative purposes articulated in K.S.A. 38-1601 are not defeated when the hearing is not promptly held.

We hold that failure to conduct the de novo review hearing within 30 days of the appeal does not entitle a juvenile to a dismissal of his case on speedy trial grounds and that the hearing time provision of K.S.A. 38-1683(a) is directory rather than mandatory.

T.K.'s second contention on appeal is that the evidence presented to the magistrate judge was insufficient to support the adjudication of T.K. as a juvenile offender. The Supreme Court in *Findlay* took note that K.S.A. 38-1654 provides the same burden of proof in juvenile cases as in criminal matters—proof beyond a reasonable doubt—and set forth the standard for our review:

"In *State v. Pham*, 234 Kan. 649, 675 P.2d 848 (1984), the applicable test on appellate review was stated as follows:

'In a criminal action where defendants contend the evidence at trial was insufficient to support their convictions, the standard of appellate review is: Does the evidence, when viewed in the light most favorable to the prosecution, convince the appellate court a rational factfinder could have found defendants guilty beyond a reasonable doubt? [Citations omitted.] Moreover, appellate courts look only to the evidence in favor of the verdict, *they do not weigh the evidence; and if the essential elements of the charge are sustained by any competent evidence, the conviction stands.* [Citations omitted.] A conviction of even the gravest offense may be sustained by circumstantial evidence.' 234 Kan. at 667-68. (Emphasis supplied.)" 235 Kan. at 466.

T.K. was charged with two counts of assault arising out of the separate incidents in March and July 1985 recounted above. K.S.A. 21-3408 defines the act of assault:

"An assault is an intentional threat or attempt to do bodily harm to another coupled with apparent ability and resulting in immediate apprehension of bodily harm. No bodily contact is necessary."

T.K.'s arguments on appeal have little merit. With respect to the March 25 incident, he contends that his mother did not immediately apprehend bodily harm; that what she observed was preparatory to an actual assault; and that he had no ability to commit an assault. After reviewing the record of the trial, however, we find sufficient evidence to support the magistrate and

district courts in their findings. T.K.'s mother testified she was familiar with the sound of shells being loaded in a shotgun and knew that T.K. kept his shotgun in the closet. She knew from prior confrontations that T.K. had a volatile temper, and testified, "I was afraid and I hurried upstairs and I didn't call him anymore." T.K.'s mother later reiterated, "I was afraid of being bodily harmed." Whether or not T.K. had the actual ability to threaten or attempt bodily harm to his mother is beside the point under 21-3408. The record clearly supports the conclusion that T.K. had the "apparent" ability necessary under the statute to complete the offense.

While T.K. did not testify concerning the March 25 events, he did offer his version of the July 30 incident at trial. On appeal he contends that his father was not placed in immediate apprehension of bodily harm and that his actions constituted justifiable self-defense. Once again we find there is sufficient evidence to prove all of the elements of the offense of assault. T.K. testified that the wrestling match between him and his father inside the house was accompanied by blows to T.K.'s face. T.K.'s father denied hitting T.K. Both agree that at the conclusion of the wrestling episode, T.K.'s father ejected T.K. from the house. Even accepting T.K.'s version of things, it is clear the interior scuffling had ended when T.K. picked up the three-foot-long stump and charged toward the house and his father. T.K. initiated a new confrontation by his actions and his father testified it was accompanied by verbal threats and the apparent readiness to use the stump to force entry into the house. When asked why he stood aside to allow T.K. to proceed past him and enter the house, T.K.'s father responded, "Well, I figured that he was going to use it on me." In short, the court could have properly concluded the testimony did not support T.K.'s self-defense theory and that T.K.'s father did experience a legitimate concern for his physical safety at the time.

Affirmed.